UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
ALAN F. CAMPBELL,

                    Plaintiff,                    MEMORANDUM AND ORDER
                                                   CV-02-3084
          -against-

LIBERTY TRANSFER CO.,

                    Defendant.
------------------------------X
A P P E A R A N C E S:

For Plaintiff:
     William Coudert Rand, Esq.
     711 Third Avenue, Suite 1505
     New York, New York 10017

For Defendant:
     Mintz & Fraade, P.C.
     488 Madison Avenue – Suite 1100
     New York, New York 10022
        By: Alan P. Fraade, Esq.
            Edward C. Kramer, Esq.

HURLEY, Senior District Judge

          Presently before the Court is the motion of Liberty

Transfer Co. ("Liberty" or "defendant") for reconsideration of my

Order of August 19, 2005, in which I denied, as untimely, its

post-trial Fed. R. Civ. P. 50(b) application for judgment as a

matter of law.

          For the reasons indicated _infra_, that motion is granted

and, upon reconsideration, judgment is awarded to defendant as to

the UCC-based and conversion causes of action, but denied as to

the negligence claim.  As to that claim, a new trial is required.

                JURY'S VERDICT AND ENTRY OF JUDGMENT

          On June 18, 2004, the jury returned a verdict in favor

of plaintiff Allen F. Campbell ("plaintiff" or Campbell) against

defendant on each of plaintiff's three causes of action, those

being a claim under Uniform Commercial Code § 8-401, a claim for conversion, and one based on negligence. Although the concomitant judgment was prepared on the same date the verdict was returned, viz. June 18, 2004, it was not entered until July 2, 2004. By letter dated July 8, 2004, defendant requested that the judgment be vacated based on "several issues left unresolved." Those issues were identified thusly:

> The first issue was our motion for judgment at the conclusion of Plaintiff's case, on which the Court reserved decision. The next issues were the multitude of legal and factual issues with respect to Rule 144, to which all parties agreed, stipulated and consented would not go to the jury, but would remain with the Court to decide in the event of a Plaintiff's verdict. These issues generally deal with whether or not the Plaintiff could have legally sold shares under Rule 144, and complied with such legal requirements, at the time he alleges damages accrued, and whether or not the Defendant could have issued free trading shares under Rule 144 without undue exposure to violations of the Securities Laws.

> There are also the post trial issues regarding the verdict itself and whether or not it was contrary to the weight of the evidence. As well, there was the issue of whether or not Plaintiff set forth a prima facie case on damages, considering there was no expert testimony and no evidence of sufficient volume to sell the shares at the price claimed during the time Plaintiff claims he would have sold the shares, as well as the effect on price of dumping shares in a thinly traded securities market.

(Letter from Edward J. Kramer, Esq. to Court dated July 8, 2004 at 1-2.)

Defendant's July 8th letter application was granted,

resulting in the July 2, 2004 entry of judgment being vacated. Thereafter, for reasons to be explained momentarily, the vacated judgment was reentered on August 19, 2005.

<u>PARTIES' INITIAL POST-TRIAL MOTIONS</u>

Among defendant's initial post-trial motions was one "for summary judgment [as of] the conclusion of Plaintiff's case" and another labeled as a "post-trial motion to set aside the jury's findings." (Def.'s Mem. in Supp. at 1.) Those motions were deemed to be made pursuant to Fed. R. Civ. P. 50(b), and considered as one post-verdict motion seeking judgment as a matter of law on a number of different grounds. In opposing that application, plaintiff took the position that the Court lacked jurisdiction to entertain defendant's request on several grounds, including that it was made more than ten days after entry of judgment, and thus ran afoul of the ten day jurisdictional period established in Rule 50(b).

Rather than addressing the threshold jurisdictional arguments broached by plaintiff, defendant inexplicably confined its argument solely to what it perceived to be the substantive merits of its positions and the flaws in those advanced by plaintiff. In any event, by decision dated August 19, 2005, I (1) denied defendant's Rule 50(b) motion as untimely, and (2) declined, as unnecessary, to address its application on the merits. Judgment was entered in favor of plaintiff, consistent with the jury's verdict and the August 19th decision, on August 22, 2005.

DEFENDANT'S MOTION FOR RECONSIDERATION

By notice of motion filed on September 1, 2005, Liberty moved for reconsideration.  In doing so, it argued, correctly as it develops, that the judgment in this case was not entered on the same date as the jury returned its verdict, to wit June 18, 2004, as the Court had found (see Aug. 19, 2005 Order at 5), but rather on July 2, 2004.  As a result, defendant's July 8, 2004 letter was, contrary to the conclusion reached by the Court, timely.

As noted, defendant did not initially respond to plaintiff's timeliness argument.  While reconsideration motions are not intended as vehicles for litigants to advance new arguments following receipt of an adverse decision, here such relief is justified given: (1) the case's convoluted post-verdict procedural history (see Aug. 19, 2005 Order, nn.3-4), and (2) defendant's letter was clearly filed within ten days of the correct entry date.  Under the circumstances, the August 19, 2005 Order erroneously dismissing defendant's Rule 50(b) motion as untimely is vacated.

ADDITIONAL ARGUMENTS ADVANCED BY PLAINTIFF
REGARDING COURT'S JURISDICTION TO ENTERTAIN
DEFENDANT'S RULE 50(B) MOTION

Typically, the Court, having vacated its earlier Order, would proceed directly to address defendant's motion for judgment as a matter of law on the merits.  However, plaintiff, in opposing defendant's current motion, mentions two other grounds in support of his position that the Court lacks jurisdiction to

-4-

disturb the jury's verdict, viz. (1) "[d]efendant[] waived its
right [to seek judgment as a matter of law] by failing to move
for judgment . . . at the conclusion of the evidence," and (2)
"[d]efendant violated Rule 50(b)'s ten day limitation by filing
its post verdict motion for judgment as a matter of law during
mid-November 2004 which was far later than ten days after even
the later July 2, 2004 entry date." (Decl. in Opp'n to Def.'s
Mot. for Recons. at 2.) These two arguments will be addressed
seriatim.

>    1.   Defendant's Purported Failure to Make
>         Rule 50(a) Motion at End of all the Evidence

This argument by plaintiff was broached, and expressly
rejected earlier by the Court in its August 19, 2005 decision.
(Aug. 19, 2005 Order at 4-5.) By way of supplementing what was
said then, it warrants mention that "[t]he purpose of requiring
the moving party to articulate the ground on which JMOL is sought
is to give the other party an opportunity to cure the defects in
proof that might otherwise preclude him from taking the case to
the jury. The articulation is necessary . . . so that the
responding party may seek to correct any overlooked deficiencies
in the proof." Goldieri-Ambrosini v. Nat'l Realty & Dev. Corp.,
136 F.3d 276, 286 (2d Cir. 1998) (internal quotation marks and
citations deleted).

That purpose was more than adequately served in this
case although Liberty did not expressly move for judgment as a

matter of law at the conclusion of all the evidence.  To begin
with, defendant explained its position in detail following the
presentation of plaintiff's case-in-chief.  (Trial Transcript
("Tr.") at 118-129; 139-140.)  At that time, the Court
"reserve[d] decision on the motion," and indicated that it would
do the same "after the defendant has put in its case, assuming it
does put in a case."  (Id. at 140-141.)  Thereafter, the defense
called one witness, Lisa Conger ("Conger").  Following her brief
testimony, both sides rested.  The pre-summation charge
conference was then conducted, during which the defendant
mentioned again the arguments embodied within its Rule 50(a)
motion made at the conclusion of plaintiff's case-in-chief.  (Id.
at 171 to 205; see also id. at 161-163.)

        For the reasons provided in the August 19, 2005
Order, as supplemented above, I find that Liberty has not
waived its right to assert its current Rule 50(b) motion.
Clearly, defendant provided specific notice of what it
perceived to be the deficiencies in plaintiff's proof "before
the case [was] submitted to the jury."  Fed. R. Civ. P.
50(a)(2).  And, as explained infra, the deficiencies cited were
not truly factual in nature, but rather concerned the legal
conclusions to be drawn based on a given set of undisputed
material facts.

> 2. Purported Untimeliness of Rule 50(b) Motion
>    Based on Judgment Being Entered on July 2, 2004

Plaintiff's argument in toto on this point, including the caption, reads as follows:

> **B.    Defendant violated Rule 50(b)'s ten day time limitation by filing its post verdict motion for judgment as a matter of law during mid-November 2004 which was far later than ten days after even the later July 2, 2004 entry date.**
>
> 7.    As this Court correctly stated, the ten day time limitation is jurisdictional and cannot be enlarged by the Court.  See Ex. A [i.e. Court's Aug. 19, 2005 Order]; Decision at p. 6-7.

(Decl. in Opp'n to Def.'s Mot. for Recons. at 2-3.)

Defendant's response is even shorter than plaintiff's presentation on this point in that it is nonexistent.

Perhaps, plaintiff means to suggest that the July 8, 2004 letter may not be construed as a Rule 50(b) motion in that it simply conveys an intention to make a future Rule 50(b) motion, as distinct from actually making such a motion with briefs to follow.  See Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 230-32 (2d Cir. 2000); Rodick v. City of Schenectady, 1 F.3d 1341, 1346-47 (2d Cir. 1993).  Otherwise, plaintiff's abbreviated argument is difficult to fathom.  As noted, the initial judgment was entered on July 2, 2004.  Defendant's July 8th letter — although beyond Rule 50(b)'s ten day period if erroneously measured from the June 16, 2004 date as I did in

crafting the August 19, 2005 Order — obviously was filed within
ten days of the correct entry date.  As a result, if the July
8th letter constituted a Rule 50(b) motion, that motion was
timely notwithstanding that the accompanying briefs were not
filed until mid-November 2004.

Here, the issue of whether defendant's July 8, 2004
letter constituted a Rule 50(b) motion need not be resolved
because (1) the July 2, 2004 entry of judgment was vacated by
Order dated August 12, 2004, and (2) judgment was thereafter
entered on August 22, 2005 (pursuant to this Court's Order of
August 19, 2005), i.e. well after defendant had submitted its
Rule 50(b) motion papers in mid-November 2004.  And a motion
submitted prior to the entry of judgment, though premature, is
deemed to be timely.  See Fed. R. Civ. P. 50 advisory
committee's note on 1995 Amendments (by providing that a
renewed motion may be filed "'no later than'" 10 days after
entry of judgment, rather than "'within'" 10 days, Rule 50(b)
authorizes "post-judgment motions that sometimes are filed
before actual entry of the judgment by the clerk.").

In sum, defendant's mid-November 2004 full fledged
motion was timely as predating the entry of judgment in August
2005.

      3.  Conclusion Regarding Plaintiff's Two
          Other Jurisdictional Arguments

For the reasons indicated, the Court concludes that

it has jurisdiction to entertain defendant's Rule 50(b) motion on the merits and, thus, will do so after providing the underlying facts to place the dispute in context.

<u>FACTS</u>

By agreement dated April 11, 1995, plaintiff, d/b/a Garantia Private Investments, invested $100,000 with NFE Entertainment, Inc. ("NFE"), for the purpose of financing the career of a country western singer. That money, rather than being used for the intended purpose, was improperly funneled to a related corporation, Panther Mountain Water Park, Inc. ("PMWP").

Upon learning of the diversion of the $100,000, plaintiff understandably complained. The ensuing dispute was "seemingly resolved by Panther/NFE Entertainment/Amoruso[1] offering to return the $100,000 investment proceeds" which offer was accepted by plaintiff. (Trial Exhibit ("Tr. Ex.") T at 2, ¶ 7.) But the promised repayment was not made, causing plaintiff to commence an action in March of 1996 against PMWP, NFE and Amoruso. That suit ultimately led to the parties executing a settlement agreement on March 15, 1999. (Ex. A to Tr. Ex. G.)

The March 15, 1999 agreement required: (1) PMWP and NFE to pay plaintiff $10,000 on or before April 30, 1999, (2) PMWP to execute a promissory note in favor of plaintiff in the

---

[1] Amoruso was the president and CEO of NFE in 1995.

amount of $20,000 to be paid on or before April 30, 2000, (3)
PMWP to deliver to plaintiff on or before March 30, 1999
"575,000 unrestricted and freely tradeable shares" of PMWP (<u>id.</u>
¶ 2(c)), (4) PMWP to deliver to plaintiff on or before April
30, 1999 "a letter opinion of its counsel that the above
referenced stock is unrestricted and freely tradeable; provided
however the failure to deliver such opinion shall not be an
event of default [and, should plaintiff go] forward with the
closing of the settlement without such opinion, [PMWP's]
contractual covenants that said stock is unrestricted and
freely tradeable shall remain in full force and effect," (<u>id.</u>),
and (5) that PMWP's aforementioned obligations "shall be
secured by an Agreed Judgment in favor of [plaintiff] from
[PMWP] in the principle [sic] amount of One Hundred Thousand
Dollars ($100,000.00)" (<u>id.</u> ¶ 2(d)).

On March 25, 1999, PMWP passed a resolution
authorizing its transfer agent, Liberty, to issue 575,000
shares of PMWP common stock to plaintiff. (Tr. Ex. S.)  Absent
from the corporate resolution was any suggestion that the
transferability of the 575,000 shares was to be restricted in
any fashion.  Upon receipt of the resolution, Liberty issued an
unlegended share certificate for the 575,000 PMWP shares.  The
share certificate was sent by Liberty to PMWP for delivery to
plaintiff.  However, the next day, Conger, the manager of
Liberty, discovered that her subordinate had not placed a
legend on the stock certificate indicating that the "shares . .

. are not able to be sold on the open market." (Tr. at 144.)

Conger immediately called "Steve Thompson ["Thompson"] of Panther Mountain." (Id. at 149.) He "let [her] know that he was aware that the stock was restricted and [told her to] mark [Liberty's] records accordingly." (Id.) Liberty did so. Nonetheless, PMWP sent the unrestricted certificate to plaintiff's then counsel under covering letter dated April 1, 1999. That letter included the following comment:

> As we discussed last Friday, I was led to believe that this was 144 stock, however I am no longer sure this is the case. I have been advised that counsel in New York is drafting an opinion that this stock [is] unrestricted and freely tradeable rather than 144 stock. However, if this is not the case I am making arrangements to have the necessary stock available as quickly as possible and I will present you with a new certificate for those shares in exchange for this certificate.

(Ex. C to Tr. Ex. G.)

Approximately six weeks thereafter, i.e. on or about May 17, 1999, plaintiff delivered his stock certificate to his broker and directed the broker to sell the shares into the market over a period of time. That process resulted in 155,000 shares being sold at an average price of 25 cents per share during the period from May 18 to June 2, 1999. But when plaintiff's stock certificate was delivered to Liberty, Liberty declined to effect the transfers on the basis that the certificate was "restricted." (Tr. Ex. B ("Uniform Rejection

Notice" dated "5/25/99".)[2]  At the same time, Liberty affixed a stamp to plaintiff's certificate indicating that he had "acquired [his shares] for investment," and that the shares could not be publically offered for sale unless certain conditions were satisfied.  (Tr. Ex. A.)

Plaintiff endeavored to correct the situation initially by calling Conger.  She referred him to Thompson who, in turn, directed him to contact Steven Sanders ("Sanders"), PMWP's "SEC lawyer[] in New York City."  (Tr. at 42.) Plaintiff called Sanders but was advised that he was "out of town."  (Id.)  Plaintiff "also spoke [without success] with Frank Chandler . . . who had . . . delivered the [unrestricted] certificate to [plaintiff's] attorney" under the previously noted covering letter of April 1, 1999.  Id.

Given that PMWP's transfer agent had refused to record the transfer of the 155,000 shares, and that PMWP and Liberty declined to take any steps to correct the problem, plaintiff went back to court for the purpose of enforcing the March 15, 1999 settlement agreement.  That court issued a judgment on September 21, 1999 which, inter alia, directed PMWP to "issue 575,000 unrestricted and freely tradeable shares" of PMWP stock to plaintiff, and to pay plaintiff $100,000, plus interest, based on PMWP's failure to comply with its obligations under the settlement agreement.  (Tr. Ex. I.)

---

[2]  For simplicity sake, the date of the rejection will be referred to henceforth in the text as "May 1999."

True to form, PMWP ignored its obligations under the September 21, 1999 judgment, leading plaintiff to return once again to the Texas court. This time, the court signed an order to show cause directing various PMWP individuals to explain on October 26, 2000 why each should not be held in contempt. (Tr. Ex. J.)

Apparently while the contempt application was pending, PMWP hired John A. Spinuzzi, Esq. ("Spinuzzi") to provide an opinion as to (a) whether plaintiff's 575,000 shares "may be offered and sold into the public market or in private transactions without an effective registration statement," and (b) whether "the Stock Transfer Agent may permit the issuance of new certificates without any restrictive legend thereon and to permit any transfers of the involved shares without violation of the registration provisions of the Securities Act." (Tr. Ex. T at 1.)

By letter dated December 8, 2000, Spinuzzi opined:

> It is the undersigned's conclusion and opinion that Mr. Campbell is entitled to offer and to sell the involved securities into the public market through normal brokerage transactions and/or in private transactions without any restrictions upon such transfers for the reason he is entitled to utilize the transactional exemption provided by Section 4(1) of the Securities Act in that Mr. Campbell is not an "issuer," "underwriter" or "dealer" within the meaning of the Securities Act.

(Id. at 5.)

Spinuzzi's letter was sent to Liberty which then

-13-

issued six unrestricted stock certificates totaling 575,000 shares on December 7, 2000.  Those shares were sold for between 2 cents and 5 cents a share during the period from December 19, 2000 to January 22, 2001, with the total sales proceeds being $18,179.37.

Plaintiff maintains, inter alia, that "[a]s a result of Liberty's wrongful failure to transfer the [155,000] shares in [May 1999 when the price was approximately 25 cents per share, and by affixing the restrictive legend thereby preventing any further sales in the open market at that time at that price, he] lost approximately $206,070.63, plus interest." (First Am. Compl. ¶ 2.)

### DISCUSSION ON MERITS OF DEFENDANT'S RULE 50(B) MOTION SEEKING VACATUR OF JURY'S VERDICT AND JUDGMENT AS A MATTER OF LAW

1. Rule 50(b) Standard

As explained in Galdieri-Ambrosini:

> The standard governing motions for judgment as a matter of law ("JMOL") pursuant to Rule 50, formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict, is well established.  Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor.  In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence.

136 F.3d at 289.

### 2. Court's Review Confined Solely to Issues of Law

My role in determining whether defendant is, notwithstanding the jury's verdict, entitled to judgment as a matter of law is limited to issues of law. That maxim is complicated here in that defendant has maintained throughout the course of the post-verdict period, (contrary to the record, as well as to the recollections of the Court and opposing counsel), that "all [sic] parties agreed, stipulated and consented" that the Court would decide the "multitude of <u>legal</u> and <u>factual issues</u> with respect to Rule 144" should the jury return a verdict in favor of plaintiff. (Letter from Edward J. Kramer, Esq. to Court dated July 8, 2004 at 1)(emphasis added).)

As explained in this Court's Order of August 19, 2005, defendant is correct as to the legal issues only. (<u>See</u> Aug. 19, 2005 Order at 9-14.) During the charge conference, it was noted that plaintiff's undecided Rule 50(a) application for judgment as a matter of law regarding Rule 144 issues would be decided by the Court following submissions of "post verdict motions." (Tr. at 204.) It was never agreed that concomitant factual issues, if any, would be decided by the Court. (<u>Id.</u>) And, in any event, the facts concerning plaintiff's acquisition of the PMWP stock, and his efforts to sell those shares, are,

in all material respects, undisputed as acknowledged by Liberty's counsel. (<u>Id.</u> at 192 ("The particular issues on 144 . . . are all legal issues and not really appropriate for a jury.").)

In sum, the Court has confined its review of the record solely to legal issues.[3]

### 3.  Key Issues

The primary issues in this case are:

a) Was Liberty's May 1999 rejection of the 155,000 shares of PMWP stock sold by Campbell justified?;

b) Was Liberty negligent in issuing the 575,000 PMWP shares certificate to Campbell in March of 1999 absent a

_____

[3]  This Court earlier ruled in a Rule 56 context that Liberty was not entitled to judgment as a matter of law. However, insofar as relevant for present purposes, the denial of defendant's summary judgment motion, as well as plaintiff's cross-motion seeking the same relief, was based in part on the inadequacies of the submissions, as explained thusly:

> The Court notes that the parties dispute whether Defendant was justified in the May 1999 refusal to transfer shares, which is an element of a claim under this section.  <u>See</u> N.Y.UCC § 8-401(a)(5),(7); Del. UCC § 8-401(a)(5)(7).  Neither party has submitted either law or facts that would resolve this issue.

(Apr. 7, 2004 Order at 7.)

Moreover, a pre-trial denial of judgment as a matter of law does not preclude the granting of such relief post-trial. <u>St. Louis Convention & Visitors Comm'n v. N.F.L.</u>, 154 F.3d 851, 860 (8th Cir. 1998).

restrictive legend?  If so, was there adequate evidence before the jury as to proximate cause vis-a-vis the damages awarded?; and

       c) Did Liberty commit the tort of conversion by affixing a restrictive legend to Campbell's PMWP share certificate in May 1999?

    4.  <u>Format of Decision</u>

      By way of format, the Court will address plaintiff's claims based on UCC §§ 8-401 and 8-407 initially,[4] to be followed by a discussion of the negligence and conversion causes of action.[5]

    5.  UCC § 8-401 Statutory Preconditions to Liberty's
        <u>Obligation to Record Transferred Shares</u>

---

   [4] Plaintiff also asserted a claim based on UCC § 8-204. However, that claim was dismissed at the conclusion of all the evidence.  (Tr. 161, 172-76.)  <u>See also</u> discussion of § 8-401 <u>infra</u>, insofar as it discusses § 8-204.

   [5] Plaintiff states that "PMWP's state of incorporation is Delaware" and that Delaware law, as to Campbell's UCC-based claims, applies.  (Pl.'s Mem. Opp'n to Def.'s Rule 50(b) Mot. at 5.)  The defendant does not contend otherwise.  Moreover, UCC § 8-110, entitled "Applicability; Choice of Law" provides that "(a) [t]he local law of the issuer's jurisdiction, as specified in subsection (d), governs . . . the rights and duties of the issuer with respect to registration of transfer."  Subsection (d) defines "[i]ssuer's jurisdiction" as the place of incorporation.

    However, the parties, throughout their submissions, cite cases from several jurisdictions beside Delaware.  Given the absence of any indication that the law of such other states differs from Delaware's as to UCC §§ 8-401 and 8-407, citations in this opinion will be directly to the UCC, as well as decisions from various states including Delaware.  <u>Cf.</u>  <u>New Jersey Bank, N.A. v. Bradford Secs. Operation, Inc.</u>, 690 F.2d 339, 343 n.9 (3d Cir. 1982).

UCC § 8-401, entitled "Duty of Issuer to Register Transfer," provides in pertinent part:

> (a) If a certificated security[6] in registered form[7] is presented to an issuer with a request to register transfer . . ., the issuer shall register the transfer as requested if:
>
> > (1) under the terms of the security the person seeking registration of transfer is eligible to have the security registered in its name;
> >
> > (2) the indorsement or instruction is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;
> >
> > (3) reasonable assurance is given that the indorsement or instruction is genuine and authorized (Section 8-402);
> >
> > (4) any applicable law relating to the collection of taxes has been complied with;
> >
> > (5) the transfer does not violate any restriction on transfer imposed by the issuer in accordance with Section 8-204;
> >
> > (6) a demand that the issuer not register transfer has not become effective under Section 8-403, or the issuer has complied with Section 8-403(b) but no legal process or indemnity bond is obtained as provided in Section 8-403(d); and
> >
> > (7) the transfer is in fact rightful or

---

[6] "'Certificated security' means a security that is represented by a certificate." UCC § 8-102(a)(4).

[7] "'Registered form,' as applied to a certificated security, means a form in which: (i) the security certificate specifies a person entitled to the security; and (ii) a transfer of the security may be registered upon books maintained for that purpose by or on behalf of the issuer, or the security certificate so states." UCC § 8-102(a)(13).

is to a protected purchaser.

> (b) If an issuer is under a duty to
> register a transfer of a security, the
> issuer is liable to a person presenting a
> certificated security . . . for loss
> resulting from unreasonable delay in
> registration or failure or refusal to
> register the transfer.

If each of the preconditions set forth in (a)(1) through (7) is satisfied, "the issuer" is required to register the stock transfer. <u>Bender v. Memory Metals, Inc.</u>, 514 A.2d 1109, 1114 (Del. Ch. 1986). An unreasonable delay in doing so will render the issuer liable for resulting loss. UCC § 8-401(b). Here, the issuer is PMWP. Nonetheless, Liberty, as PMWP's "transfer agent," "has the same obligation to the holder or owner of a certificated . . . security with regard to the particular functions performed as the issuer has in regard to those functions." UCC § 8-407.

### 6. Applicability of § 8-401 to Transferers

Liberty insists that Campbell, as the seller of the PMWP shares presented for transfer in May 1999, lacks standing to assert a § 8-401 claim. No authority has been provided in support of that position. Instead, the Court is merely advised that "no case has been found under UCC § 8-401 . . . where the transferor maintains the cause of action." (Def.'s Post-Trial Br. at 17.) Assuming such to be the case, that does not mean that Campbell is beyond the ambit of those intended to be protected by the statute.

Initially, it is noted that there is an absence of

language in the statute limiting its benefits to transferees.
Instead the statute indicates that "[i]f a certificated
security in registered form . . . is presented . . . with a
request to register transfer . . . , the issuer [or its
transfer agent] shall register the transfer as requested if
[the seven preconditions are satisfied]."  UCC § 8-401(a).

Adoption of defendant's argument would not only be
out of sync with a plain reading of the statute, it would also
produce an anomalous result assuming for a moment that Liberty
was required to record the May 1999 transfers.  When Liberty
refused to transfer the shares which Campbell had sold, he
entered the open market to purchase the shares for delivery to
the purchaser.  As a result, the purchaser was not injured by
Liberty's failure to perform its purported obligations under §
8-401.  Rather the aggrieved party would have been Campbell.
Yet, if defendant's view is accepted, neither the non-injured
purchaser could sue Liberty, nor could Campbell.  The absurdity
of that result evidences the inadequacies of the argument.

Finally, assuming again that Liberty is correct in
advising the Court that there are no reported cases under § 8-
401 in which a non-transferee was a successful plaintiff,
reference to UCC § 8-204 indicates that such absence is a
happenstance rather than attributable to anything written or
fairly implied in § 8-401.

Section 8-204, entitled "Effect of Issuer's
Restriction on Transfer," reads as follows:

> A restriction on transfer of a security
> imposed by the issuer, even if otherwise
> lawful, is ineffective against a person
> without knowledge of the restriction unless
> . . . the restriction is noted
> conspicuously on the security certificate .
> . . ."

UCC § 8-204(1).

Unlike the language in § 8-401, a reading of § 8-204 suggests that typically the aggrieved party will be a transferee, i.e. a person who purchased or otherwise acquired unlegended stock without knowledge of a restriction on transfer imposed by the issuer. As to such transferees, the restriction is ineffective. Yet in such cases as <u>Edina State Bank v. Mr. Steak, Inc.</u>, 487 F.2d 640 (10th Cir. 1974) and <u>Dean Witter Reynolds, Inc. v. Selectronics, Inc.</u>, 594 N.Y.S.2d 174 (1st Dep't 1993), we see non-transferees successfully pursuing claims against issuers and their transfer agents unencumbered by lack of standing arguments being asserted.

In <u>Edina State Bank</u>, a plaintiff bank sued a corporate issuer of stock for damages based on the issuer's refusal to record the shares of stock which it had sold under its rights as a pledgee. On the issue of standing the Tenth Circuit noted:

> "The bank as pledgee was among the persons
> protected generally by § 8-204 against a
> restriction not conspicuously noted on the
> security, except to a person with actual
> knowledge. The wrongful refusal to
> transfer gave rise to a right to sue as for
> conversion by the bank as transferor."

487 F.2d at 644.

Similarly in <u>Dean Witter Reynolds, Inc.</u>, Dean Witter was in the process of selling Selectronics shares on behalf of its client, which shares appeared to be fully negotiable. "However, the Securities Clearing House, where the shares were sent for re-registration by Selectronic's transfer agent, defendant Mellon Bank, refused the certificates and returned them to plaintiff with, for the first time, restricted legends manifested on their face." 594 N.Y.S.2d at 175. The First Department, citing a number of cases including <u>Edina State Bank</u>, held that the plaintiff transferor, Dean Witter, had standing to sue the transfer agent.

Finally, Campbell cites <u>CAPM Corp. Advisors AB v. Protegrity, Inc.</u>, 2001 WL 1360122 (Del. Ch. 1991) for the proposition that he has standing to sue Liberty for a violation of UCC § 8-401(a)(1) under Delaware law. Although <u>CAPM</u> is, at best, obliquely on point, it, nonetheless, lends some additional credence to plaintiff's position. CAPM was the record owner of, and held a certificate for 1,250,000 shares of Protegrity's common stock. It sold 307,000 of those shares, thereupon it tendered its one certificate to Protegrity's transfer agent with a request that new certificates be issued to the purchasers evidencing the shares that were sold, and to CAPM for the remaining 943,000 shares. While the transfer agent readily complied with the request with respect to the new owners (unlike the case at bar), it refused to deliver new

certificates to CAPM apparently due to a dispute as to
beneficial ownership of the shares.  In an effort to justify
that inaction, the defendant maintained "that the word
'transfer' in § 8-401(a) should be limited to an interpretation
involving those situations in which an owner requests that an
issuer deliver (i.e. 'transfer') certificates to a third party
in a transaction involving an actual change in legal ownership
in contrast to those situations like this one, involving the
issuance (i.e. 'transfer') of a certificate evidencing reduced
holdings to an existing shareholder."  CAPM Corp. Advisors AB,
2001 WL at *4.  That argument was found to be devoid of merit.

The relevance of CAPM for present purposes is that
CAPM was a transferor which was not confronted by the Court,
sua sponte, or otherwise with a lack of standing argument akin
to that mounted by Liberty.

In sum, § 8-401 obligates an issuer, or its transfer
agent, to take the necessary steps to record a sale of its
stock when the seven preconditions in the statute have been
satisfied.  The failure to perform that duty may cause harm to
a transferee or a transferor and either, depending on the
circumstances, may seek damages for a statutory violation.
Accordingly, Campbell's status as an appropriate plaintiff does
not depend on whether he is as a transferor or transferee.
Defendant's argument to the contrary is found to be unavailing.

Having found that Campbell has standing to assert a

-23-

violation of § 8-401, attention will now be focused on that section. Of the seven preconditions previously quoted, only subsections (5) and (7) warrant discussion as arguably relevant.

> 7.  Discussion of Subsections (5) and (7)
>     of Section 8-401(a)

Under subsection (a)(5), Liberty was not required to record the 155,000 shares of PMWP stock sold by Campbell if the attempted transfer would have violated "any restriction on transfer imposed by the <u>issuer</u> in accordance with Section 8-204." UCC § 8-401(a)(5)(emphasis added). For purposes of the present discussion, it will be assumed that transferability of the subject shares was restricted under SEC Rule 144 as urged by defendant. But was the restriction "imposed by the issuer"?

Defendant, in arguing during trial that § 8-204 should not be charged to the jury as a separate cause of action, maintained, as it does currently, that § 8-204 has no bearing on the issues at hand. In defendant's view, the purported restriction on transferability is attributable solely to the SEC and its rule making powers as distinct from an action taken by PMWP.

Defendant's argument was accepted by the Court at the charge conference based on (1) a literal reading of the statute, (2) N.Y. UCC § 8-204 cmt. 5 ("This section deals only with restrictions imposed by the issuer. Restrictions imposed by statute are not affected."), and (3) the rationale espoused

in <u>Brass v. American Film Techs.</u>, 780 F. Supp. 1001 (S.D.N.Y. 1991), <u>aff'd in part, rev'd in part</u>, 987 F.2d 142 (2d Cir. 1993). (Tr. at 172-76.) As a result, plaintiff's request to, in effect, bifurcate for the jury his "UCC Article 8" "First Claim for Relief" (First Am. Compl. ¶¶ 20-26) into two separate causes of action grounded on § 8-401 and on § 8-204 respectively, was denied. Only the § 8-401 claim was presented to the jury. The same logic applies now. Accordingly, subdivision (5) of § 8-401(a) does not cast doubt on the jury's verdict. Which is to say, since § 8-204 is not implicated, Liberty's refusal to record the transfer of 155,000 shares of plaintiff's PMWP stock in late May of 1999 may not be justified on the ground that transfer would have violated a "restriction on transfer imposed by the issuer." UCC § 8-401(a)(5).

The question remains whether precondition (7) to Liberty's obligation to record has also been satisfied. Was the transfer "in fact rightful"? UCC § 8-401(a)(7).

As noted, defendant has not specifically addressed subdivision (7). However, by arguing that applicable securities laws, including Rule 144, prohibited it from recognizing the transfer and issuing freely tradeable shares, it has interjected subdivision (7) into the analysis. Simply put, if recording the May 1999 transfers would have run afoul of SEC Rule 144, Campbell's request would not have been "rightful." <u>See</u> discussion <u>infra</u>. To conclude otherwise, i.e. that "rightfulness" under state law should be determined

independent of applicable federal statutes and regulations, would be inconsistent with the Supremacy Clause. <u>Charter Oak Bank & Trust Co. v. Registrar & Transfer Co.</u>, 358 A.2d 505, 509-10 (N.J. Super. 1976).

>8. Campbell's Requested Transfer of PMWP
>Stock was not "Rightful" for Purposes
>of UCC § 8-401(a)(7) as a Matter of Law

To determine whether plaintiff has satisfied his burden of showing that the requested transfer of PMWP shares was "rightful," thus satisfying UCC § 8-401(a)(7), requires reference to the Securities Act of 1933 (15 U.S.C. §§ 77a et seq.) and to regulation 17 C.F.R. § 230.144 ("Rule 144").

>a) Overview of Securities Act of 1933
>and Rule 144 insofar as Relevant
>for Present Purposes

As succinctly explained in <u>Bender v. Memory Metals</u>:

> The 1933 Act generally makes it unlawful for any person to sell any security that is not registered unless an exemption from registration is applicable. 15 U.S.C. § 77e(a) and § 77d. Section 4(1) of the Act (15 U.S.C. § 77d(1)) provides an exemption for sales made by persons other than an "issuer, underwriter or dealer". Because of the Act's broad definition of the term "underwriter", Rule 144 was adopted to provide a "safe harbor" exemption in certain circumstances in which the seller might otherwise be considered to be an "underwriter". Under that Rule, a sale is exempt if it meets all the requirements of Rule 144.

514 A.2d 1109, 1112 n. 5 (Del. Ch. 1986).

Subdivision(k) of Rule 144 provides:

> Termination of certain restrictions on
> sales of restricted securities[8] by persons
> other than affiliates. The requirements of
> paragraphs (c), (e), (f) and (h) of this
> section shall not apply to restricted
> securities sold for the account of a person
> who is not an affiliate of the issuer at
> the time of the sale and has not been an
> affiliate during the preceding three
> months, provided a period of at least two
> years has elapsed since the later of the
> date the securities were acquired from the
> issuer or from an affiliate of the issuer.[9]

17 C.F.R. § 230.144(k).

### b) <u>Statutory Definition of Underwriter</u>

Central to the present dispute is whether Campbell was an

"underwriter." That term is defined in the Act as including

"any person who has purchased[10] from an issuer with a view to .

. . the distribution of any security . . . ." 15 U.S.C. §

---

[8]  "The term 'restricted securities' means . . .
[s]ecurities, acquired directly or indirectly from the issuer, or
from an affiliate of the issuer, in a transaction or chain of
transactions not involving any public offering. . . ."

17 C.F.R. § 230.144(a)(3).

[9]  The subjects of the paragraphs referenced in 17 C.F.R. §
230.144(k), as reflected in their respective captions, are as
follows: (c) "Current public information," (e) "Limitation on
amount of securities sold," (f) "Manner of sale," and (h) "Notice
of proposed sale."

[10]  Although plaintiff received the PMWP stock in settlement
of a lawsuit, it would appear that he is the equivalent of a
"purchaser" in that he gave value for the shares. Neither party
has suggested otherwise. <u>Cf. Charter Oak Bank & Trust Co.</u>, 358
A.2d at 509 (pledgee bank, endeavoring to sell shares following
default of loan repayment obligations by pledgor, "was an
underwriter within meaning of [§ 77b(a)(11)].")

77(b)(a)(11).

The label attached to Campbell's acquisition of the PMWP shares is significant because shares held by a person who is not an issuer, underwriter or dealer are freely tradeable. See 15 U.S.C. § 77(d)(1); see also Bender, 514 A.2d at 1117 ("[B]ecause no showing is made that Ms. Bender would be selling her shares as a dealer, issuer, or underwriter, as those terms are used in the 1933 Act, the proposed transfer would be exempt under § 4(1) of the 1933 Act [15 U.S.C. § 77(d)(1)].").

c) Position of Parties

i) Plaintiff's Position

Campbell maintains that the unlegended PMWP shares he received in March 1999 were freely tradeable. He was entitled under the stipulation of settlement to such unencumbered shares and, accordingly, so the argument continues, Liberty acted inappropriately in affixing a restrictive legend to his stock certificate in May of 1999, and in refusing to record the transfer of shares. The basis for that argument is twofold: (1) he was not an underwriter and (2) even if, arguendo, he fits within the statutory definition of an underwriter, he held the shares for over two years prior to their sale and attempted transfer, thus rendering the shares freely tradeable under the safe harbor provisions of Rule 144.

ii) Defendant's Position

Liberty contends, inter alia, that (1) Campbell was an underwriter as to the restricted PMWP's shares he held in May 1999, which accordingly, were not freely tradeable, (2) as a result, Liberty was required to affix a restrictive legend to the share certificate, and (3) consistent with that legend, it could not honor the transfer of shares, absent a registration statement for the shares, a "no action" letter from the Securities and Exchange Commission, or an attorney's opinion letter to the effect that registration was not required under the Act.

d) Campbell "Acquired" the PMWP Shares in March 1999, Both for Purposes of Determining (i) Whether he was an Underwriter, and (ii) for Calculating the Holding Period Prior to Sale Under 17 C.F.R. § 230.144(k)

i) Campbell was an Underwriter

The following excerpt from the Preliminary Note to Rule 144 is helpful:

> Individual investors who are not professionals in the securities business may . . . be "underwriters" within the meaning of that term as used in the Act if they act as links in a chain of transactions through which securities move from an issuer to the public.  Since it is difficult to ascertain the mental state of the purchaser at the time of his acquisition, subsequent acts and circumstances have been considered to determine whether such person took with a view to distribution at the time of his acquisition.  Emphasis has been placed on factors such as the length of time the

person has held the securities and whether
there has been an unforeseeable change in
circumstances of the holder.

17 C.F.R. § 230.144 preliminary note ¶ 2.

There is no evidence that Campbell experienced any "unforeseeable change in circumstances" after his receipt of the PMWP shares which prompted his divesture efforts. <u>Id.</u> Similarly absent from the record is evidence suggesting that Campbell intended to retain his PMWP shares as an investment. Nonetheless, before Campbell may be legitimately labeled as an underwriter or non-underwriter, a threshold determination must be made. If the temporal reference point is, as defendant argues, when Campbell received the 575,000 PMWP shares in April of 1999, he was an underwriter. After all, he sold 155,000 shares between May 18 and June 2, 1999, as part of the plan to sell his entire interest in PMWP over a relatively brief period of time. However, if the reference point is four years earlier as plaintiff maintains, i.e. when he invested in NFE, then he was not an underwriter, and the requirements of 15 U.S.C. § 77(e) and Rule 144 are inapplicable.

Plaintiff simply opines, without proffering any supporting authority, that "Mr. Campbell was an underwriter only if he purchased the 1995 Investment Contract with a view to distribution," as if the selection of that year is somehow self evident. (Pl.'s Mem. Opp'n to Def.'s Rule 50(b) Mot. at

12 (internal quotation marks and citation deleted).) It is not, and, in fact, it is the wrong year.

The 575,000 shares were obtained in settlement of a lawsuit. Although there appears to be an absence of case law on point, the Securities and Exchange Commission has rendered numerous no-action letters concerning the relationship between settlement dates and the commencement of holding periods. <u>See, e.g.</u>, Dorado Micro Systems, SEC No-Action Letter, 1982 WL 29164 (March 22, 1982); Pay Television Corp., SEC No-Action Letter, 1979 WL 14469 (Sept. 28, 1979); and Diagnostic Research, Inc., SEC No-Action Letter, 1971 WL 9645 (Dec. 4, 1970).

The SEC rule evident from a perusal of the above cited no-action letters is as follows: if the settlement establishes that the aggrieved party should have received the subject shares at some earlier time, the SEC will compute the holding period based on when the shares should have been received. Otherwise, the settlement date marks the commencement of the holding period. (<u>See also</u> John A. Spinuzzi Dec. 8, 2000 Op. Letter, Trial Ex. T ¶ II (8) at 5 ("The SEC takes the position that where the dispute is to determine whether the issuer or transferor owes any securities to the complainant, the holding period commences the date the suit is settled. On the other hand the SEC's position is that where the securities were to be issued pursuant to an agreement to

settle disputes actually or potentially in litigation, but such delivery was delayed, and where the intended recipient of those securities has borne the full risk of economic loss in the securities to be transferred, the holding period commences on the date that the securities should have been delivered under the settlement agreement and not on the date they were actually delivered.").)

Here, the object of Campbell's lawsuit was not to receive shares of PMWP based on a prior agreement or otherwise. Rather, the complaint sounds in breach of contract and fraud based on the $100,000 Campbell invested in NFE, with the relief sought being compensatory damages, lost profits, an accounting, and punitive damages. (Tr. Ex. G.) The notion of plaintiff receiving PMWP stock first surfaced at the settlement stage of the litigation when it was agreed in March 1999 that PMWP would, inter alia, provide him with 575,000 shares of its stock, as well as other consideration, to resolve the lawsuit. (Ex. A ¶ 2(c) to Tr. Ex. G.) Under the circumstances, it is clear that plaintiff's position regarding the 1995 date finds no support in SEC opinions. Instead, the settlement date controls. Accordingly, Campbell was, as a matter of law, an underwriter of the PMWP shares he received in March 1999 and endeavored to sell shortly thereafter.

ii) Holding Period Under 17
C.F.R. § 230.144(k)

Plaintiff further argues that his "shares were also exempt from registration under the safe harbor of Rule 144 because they had been held for more than two years under the theory of tacking."  (Pl.'s Mem. Opp'n to Def.'s Rule 50(b) Mot., caption of point "B," at 12 (capitalization of some words deleted).)

The concept of, albeit not the term, "tacking," is found in Rule 144's definition of "Conversions" which reads:

> If the securities sold were acquired from the issuer for a consideration consisting <u>solely</u> of other securities of the same issuer surrendered for conversion, the securities so acquired shall be deemed to have been acquired at the same time as the securities surrendered for conversion.

17 C.F.R. § 230.144(d)(3)(ii)(emphasis added).

A more expansive explanation of the concept of tacking is found in the following excerpt from a law review article by Professor Marc I. Steinberg of the University of Maryland School of Law:

> Subparagraph (d)(4) of the rule aids the prospective seller by setting forth specific provisions for determining the period for which the securities have been held.  The seven subsections of subparagraph (d)(4) are referred to as 'tacking' provisions and can be divided into two categories. [Since only the second of the two categories is relevant, we will bypass the first category.]
>
> . . . .
>
> The other [i.e. second] category,

subsections (i), (ii), and (iii), allows a
person to tack the period of time he or she
has held certain restricted securities to
'related' securities that were subsequently
acquired. The more recently acquired
securities 'are deemed to have been
acquired when such other securities were
acquired.' The theory is that since the
new securities do not create a change in
the holder's capital at risk and since the
more recently acquired securities emanate
from the older ones, the holding period for
the more recent securities should relate
back to when the older securities were
acquired. This category includes
securities acquired from the issuer (i) as
a dividend or pursuant to a stock split or
recapitalization, (ii) for a consideration
consisting solely of other securities of
the same issuer surrendered for conversion,
and (iii) as a contingent payment of the
purchase price of an equity interest in a
business, or the assets of a business, sold
to the issuer or its affiliate.

Marc I. Steinberg and Joseph P. Kempler, <u>The Application and</u>

<u>Effectiveness of SEC Rule 144</u>, 49 Ohio St. L. J. 473, 485

(1988); <u>see also</u> <u>Phlo v. Stevens</u>, 62 Fed. Appx. 377, 382-83 (2d

Cir. 2003)(discussing tacking in the context of the conversion

of warrants for common stock in a cashless transaction).

There is no evidence to suggest that Campbell traded

his interest in the NFE investment contract for the PMWP

shares. Indeed, the NFE investment contract is not even

mentioned in the March 15, 1999 settlement agreement. Instead,

the quid pro quo provided by Campbell for the PMWP shares and

other items of consideration furnished by the defendants in the

Texas action, was Campbell's relinquishment of the multiple

claims in his complaint and concomitant demands for
compensatory and punitive damages.  Which is to say, the
requirement that the consideration for the newly acquired
shares consist _solely_ of shares issued earlier by the same
issuer has, as a matter of law, not been satisfied.  From that
it follows that the benefit of tacking is not available to
Campbell, and the commencement date for the holding period of
his shares was March 1999, i.e. when he should have received
freely tradeable PMWP shares pursuant to the settlement
agreement, not 1995.

> iii) Conclusion Regarding Underwriter
>     Status and Holding Period

In sum, measured as of March 1999 rather than 1995,
plaintiff (1) was an underwriter under the broad definition
contained in 15 U.S.C. § 77b(a)(11), and (2) did not hold the
subject securities for a period of at least two years prior to
their presentment to Liberty for transfer in May 1999.
Accordingly, the shares were not freely tradeable as of that
time.[11]

---

[11] Before reaching the above conclusion, I perused the
December 8, 2000 letter of John A. Spinuzzi, the attorney hired
by PMWP "to render a legal opinion as to whether or not the
subject shares [could as of that date, i.e. December 8, 2000] be
offered and sold into the public market or in private
transactions without an effective registration statement."  (Tr.
Ex. T.)

    Mr. Spinizzi's affirmative response to that question is
not particularly helpful for present purposes because: (1) the

9. Campbell's Shares of PMWP Were not Freely
   Tradeable When First Presented to Liberty
   for Transfer and, Thus, the Requested Action
   was not Rightful Under UCC Section 8-401(a)(7);
   As a Result, Liberty not Required to Record
   Their Transfer

Given that the Court has determined, as a matter of

law, that Campbell was an underwriter with respect to the PMWP

shares and did not qualify for an exemption of the registration

requirements of the 1933 Act based on an extended holding

period, "the transfer . . . cannot be considered rightful" and,

accordingly, Liberty was "under no duty to register the

transfer."  Catizone v. Memry Corp., 897 F. Supp. 732, 736

(S.D.N.Y. 1995)(applying Delaware law), and cases cited

therein; cf. Charter Oak Bank and Trust Co., 358 A.2d at 509

("Where reasonable grounds exist to believe a proposed transfer

might be a 'wrongful' transfer under the Securities Act, a

_____

opinion speaks as of December 8, 2000 rather than March 1999, (2)
it cannot be squared with the definition of "Conversions" in Rule
144, nor with SEC opinions explaining the relationship between a
lawsuit settlement date and the corresponding "holding period"
commencement date, and (3) insofar as he seems to link his
opinion to the belief "that Panther Mountain recognized that the
holding period commenced at least one year and possibly two years
or more prior to the actual delivery of 575,000 shares of its
common stock to Campbell in March of 1999" (Tr. Ex. T, ¶ 9), he,
inter alia, glosses over the critical distinction between the two
referenced holding periods.  Indeed, Campbell has never claimed
that the conditions of 17 C.F.R. § 230.144(c), (e), (f), and (h)
have been satisfied (see n.9 supra), those being the
preconditions for reducing the Rule 144 "safe harbor" holding
period from two to one year.  See generally, U.S. Securities and
Exchange Commission, Rule 144: Selling Restricted and Control
Securities, http://www.sec.gov./investor/pubs/rule144.htm.

transfer agent is justified in refusing to make the requested transfer and requesting further information to show that the transfer can be made in accordance with federal law."); <u>see also</u> U.S. Securities and Exchange Commission, <u>Rule 144: Selling Restricted and Control Securities</u>, http://www.sec.gov/investor/pubs/rule144.htm ("Even if you have met the conditions of Rule 144, you can't sell your restricted securities to the public until you've gotten the legend removed from the certificate. . . . [A] transfer agent won't remove the legend unless you've obtained the consent of the issuer – usually in the form of an opinion letter from the issuer's counsel – that the restricted legend can be removed.  Unless this happens, the transfer agent doesn't have the authority to remove the legend and execute the trade in the market place.")

In sum, Liberty was justified, as a matter of law, in refusing to recognize and record the May 1999 sale by Campbell of 155,000 of his PMWP shares.

10.  UCC § 8-407 Does not Affect the Conclusion
     That the Transfer Sought by Campbell was not
     Rightful Under UCC § 8-401(a)(7)

UCC § 8-407 provides in pertinent part that a "person acting as . . . transfer agent . . . for an issuer in the registration of a transfer of its securities, [or] in the issue of new securities certificates . . . has the same obligation to the holder or owner of a certificated . . . security with regard to the particular functions performed as the issuer has in regard to those functions."  UCC § 8-407.  "The effect of this Rule is to hold the agent liable to . . . the owner or holder for . . . wrongful refusal to register a transfer if the issuer would itself be held liable."  Hawkland, Uniform Commercial Code Series, Article No. 8 Investment Securities § 406:03 at 508.  Here, PMWP was clearly required under the terms of the March 15, 1999 settlement agreement, and also under the September 22, 1999 judgment (Tr. Ex. I), to issue 575,000 unrestricted and freely tradeable PMWP shares to Campbell. Does that mean that Liberty, as PMWP's transfer agent, had the same obligation because of the agreement and court order? Before answering that question, a pivotal distinction must be drawn between contractual obligations, even if Court ordered, and the obligations of issuers and transfer agents under applicable state and federal securities laws.

Here, there is no question that the PMWP shares

issued to Campbell were "restricted shares" as that term has previously been defined. As such, the stock could not be traded in the open market under federal law absent a registration statement being filed, or the issuance of either a SEC "no action" letter or an attorney's written opinion indicating that registration was not required. PMWP could have complied with its contractual obligation by arranging for one of those three conditions to come about.[12] Until it did so, however, PMWP or, more accurately, Liberty, as its transfer agent, was precluded under federal law from treating the shares sold in May 1999 "as if" the shares were freely tradeable in the open market.

In sum, PMWP's breach of its "so ordered" settlement obligations does not override or otherwise effect its obligations under applicable security laws. And, under § 8-407, Liberty, as its transfer agent, stands in its principal's shoes and was subject to the same marketing restraints.

11. <u>Conclusion as to UCC-Based Cause of Action</u>

For the reasons indicated, Liberty is entitled to judgment as a matter of law as to plaintiff's cause of action alleging violations of UCC §§ 8-401 and 8-407.

---

[12] Alternatively, it would appear that PMWP could have bypassed the Rule 144 problem by delivering unrestricted treasury shares to Campbell, if they existed, or by acquiring the required shares in the open market.

Plaintiff also prevailed at trial on his negligence claim.[13]  The elements of that claim under New York law[14] are: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof."  Akins v. Glens Falls City School Dist., 53 N.Y.2d 325, 333 (1981).

Plaintiff posits that Liberty violated its duty of reasonable care (1) "by negligently failing to transfer Campbell's stock certificate that contained no restriction on its face" when asked to do so in May 1999, and (2) assuming, arguendo, that a restrictive legend was required, "by negligently issuing [an unlegended] share certificate [to him] in March 1999."  (Pl.'s Mem. Law Opp'n to Def.'s Rule 50(b) Mot. at 16.)  Both attorneys addressed each of these theories during their respective summations consistent with the evidence in the record.

_____

[13]  No negligence claim is contained in the complaint. However, it does appear in the Pre-trial Order, thus providing advance notice to defendant.  Moreover, the facts underlying the negligence cause of action were placed before the jury without objection, after which plaintiff, in effect, moved to conform the pleading to the proof.  That application was granted.  (Tr. 190-92.)

[14]  Given that, inter alia, this case is in federal court based on diversity of citizenship and that the charged acts and omissions of Liberty occurred in New York, New York law has been applied to plaintiff's negligence claim, as well as to the conversion cause of action discussed infra.

As previously explained, the 575,000 PMWP shares issued to Campbell were restricted securities. As such, again as previously explained, Liberty was justified (1) in refusing to effect a requested transfer absent an opinion letter, evidence of registration, or a SEC no action letter, and (2) in so indicating on the share certificate by affixing a restrictive legend. Accordingly, plaintiff's first theory of negligence falls short of the mark as a matter of law. That leaves his second theory premised on the belated affixing of the restrictive legend. The primary question necessarily implicated by the second theory is whether plaintiff would have been able to have had the encumbrance on marketability lifted sooner had the restrictive legend been placed on the certificate at the time of its issuance (rather than approximately six weeks thereafter), thereby permitting an earlier sale of the shares. The timing of the sale is significant, of course, given the erosion of the per share price during the relevant time period.

Before proceeding further, I will step back for a moment and address the threshold matter of standing. Defendant maintains that "Campbell has no standing to assert a cause of action for negligence against Liberty[] in conducting its business as a transfer agent," citing Lenhart Altschuler Assocs. Inc. v. Benjamin, 215 N.Y.S.2d 541, 28 Misc. 2d 602,

603-04 (Sup. Ct. Nassau Co. 1961).[15]  (Def.'s Post-Trial Br. at

14-15.)  That statement by defendant suffers from overbreadth

in that it fails to recognize the distinction between

"nonfeasance" and "misfeasance."  "'Nonfeasance' means the

total omission or failure of an agent to enter upon the

performance of some distinct duty or undertaking which he has

agreed with his principal to do; 'misfeasance' means the

improper doing of an act which the agent might lawfully do, or,

in other words, it is the performing of his duty to his

principal in such a manner as to infringe upon the rights and

privileges of third persons."  Black's Law Dictionary 1054 (6th

ed. 1990).

    The above distinction is pivotal to plaintiff's

second negligence theory of liability.  The May 1999 refusal to

transfer constitutes nonfeasance which, while now a proper

ground for suit under UCC § 8-401, is arguably non-actionable

under a separate common law theory of negligence.  However, the

situation is otherwise as to Liberty's issuance of the share

---

[15]  The present viability of the holding in Lenhart
Altschuler Associates (which predates the enactment of the UCC in
New York), is problematic to the extent it indicates that "no
action will lie against a stock transfer agent or officer for the
wrongful or unjustified neglect or refusal to register or
transfer stock at the request of the holder thereof."  28 Misc.
2d at 603.  Indeed, UCC § 8-407 was enacted to override that
portion of the common law which insulated transfer agents from
liability to aggrieved security holders for "mere nonfeasance"
under such circumstances.  See UCC § 8-407 cmt. ¶ 1.

certificate in March 1999 absent the required restrictive legend, coupled with the seemingly feeble efforts thereafter to assure that Campbell knew of the mistake. Those shortcomings entail the actual performance of a recognized duty, viz. the issuance of stock, but in a negligent manner with resulting harm to a third party. As such, misfeasance is implicated. And misfeasance was at common law, and remains, a recognized basis for a lawsuit by a shareholder against a transfer agent. See generally 2A New York Jur. 2d § 340 (1998), entitled "Distinctions based on nonfeasances, malfeasances, and misfeasances," at 377-78, and cases cited therein. Which is to say, Campbell has standing to assert a claim against Liberty under his second theory of negligence. As to that theory, there was abundant evidence in the record to support the jury's determination that Liberty was negligent in failing to affix a restrictive legend to the PMWP share certificate at the time of its issuance in March 1999.

Notwithstanding the foregoing, however, the resulting judgment of $106,000 may not stand. To begin with, there is no way to determine whether the jury's award was based on plaintiff's UCC-based cause of action, one (or both) of his negligence theories, or upon his conversion claim. Given that some of those possible predicates, viz. the UCC-based claim, and defendant's first negligence theory, as well as the

conversion claim (as discussed _infra_), are insufficient as a
matter of law, a new trial is required.  See _Cweklinsky v.
Mobil Chemical Co._, 364 F.3d 68, 75 (2d Cir. 2004)(vacating
jury award and remanding for new trial where award may have
been based on invalid theory); _Bruneau ex rel. Schofield v.
South Kortright Cent. School Dist._, 163 F.3d 749, 759 (2d Cir.
1998)("[W]hen alternative theories for imposing liability are
given to the jury, but one of those theories should not have
been submitted . . . the usual course is to reverse the verdict
and order a new trial because it is impossible to determine
whether the invalid theory was or was not the sole basis for
the verdict.").

        But beyond that, and to return to the plaintiff's
second theory of negligence, simply presenting sufficient
evidence at trial to establish that Liberty owed a duty to
Campbell, that Liberty breached that duty, which breach caused
some sort of amorphous injury to plaintiff, is not adequate to
defeat defendant's Rule 50(b) motion.  To accomplish the latter
result, plaintiff must show that defendant's negligence was a
proximate cause of a quantifiable harm.

        To place the proximate cause issue in context, a
brief reiteration of some of the relevant facts is in order.
As explained previously, Liberty issued the stock certificate
for the 575,000 PMWP shares in late March 1999.  Campbell sold

155,000 shares through his broker from May 18 to June 2, 1999 at an average price of .25 per share.[16]  When Liberty refused to recognize the transfer, plaintiff was required to go into the open market to purchase 155,000 shares to cover the sales. Campbell further testified that all of his shares were to be marketed "over [a] period of a couple of months" pursuant to a plan which he had developed with his broker.  (Tr. at 60.)

After further Court involvement (including an order to show cause returnable on October 26, 2000 in a United States District Court for the Northern District of Texas directing various principals of PMWP to explain why they should not be held in contempt of court [Trial Ex. J]), the restrictions were removed and Campbell received unlegended certificates totaling 575,000 shares.  Those shares "were sold in six transactions at prices ranging from 2 cents a share to 5 cents a share" (Tr. at 55), during December 2000 and January 2001 for a total of "$18,179 and change" (Tr. at 54).[17]

Plaintiff cabined his damages argument during summations to the first theory of negligence.  Specifically, he asked the jury to apply the $.25 per share realized in May 1999 upon his sale of 155,000 shares to his entire holding of

---

[16]  Trial Exhibit Q provides the daily high, low, and closing prices for PMWP common shares for the period from March 1, 1999 to July 30, 1999.

[17]  Trial Ex. R provides the exact dates, amounts received per share, and the total proceeds realized ($18,179.37) from the sale of the 575,000 PMWP shares.

575,000 shares, and then to compare the resulting figure to the sums he actually received in December 2000 and January 2001. That argument, while germane to plaintiff's first theory of negligence, is inapplicable to his second theory.

Under the second theory, the jury could have legitimately concluded that if Campbell had known of the marketability problem when Liberty issued the shares at the end of March, 1999 (rather than in mid-May when he endeavored to sell the shares), he could have resolved the problem and liquidated his interest six weeks earlier than he did. However, while we know from the evidence what the stock prices were on a per share basis for the period of March 1, 1999 to July 30, 1999, and what plaintiff received for the sales that occurred in December 2000 and January 2001, the record is silent on the per share stock prices in the interim between those two periods. Thus, for example, if plaintiff had sold his shares in October of 2000, there is nothing in the evidence to suggest what the sale proceeds would have been. Under such circumstances, the jury's damages award, if, arguendo, tied to this second theory of negligence, could only have been the product of surmise and speculation. In sum, defendant has satisfied the strict standard for judgment as a matter of law also as to plaintiff's second theory of negligence for the reason indicated.

<u>CONVERSION</u>

Plaintiff also prevailed before the jury on his New

York State based cause of action for conversion.  Under New York law, conversion is the wrongful "exercise of the right of ownership over [something] belonging to another to the exclusion of the owner's rights."  <u>Peters Griffin Woodward, Inc. v. WCSC, Inc.</u>, 452 N.Y.S.2d 599 (1st Dept. 1982); <u>see Employers' Fire Ins. Co. v. Cotten</u>, 245 N.Y. 102 (1927).

As noted <u>supra</u>, defendant was justified in affixing a restrictive legend to plaintiff's PMWP share certificate.  Accordingly, Liberty's conduct in that regard may not be labeled as a conversion.  For that reason, the defendant is entitled to judgment as a matter of law, notwithstanding the jury's verdict, as to this cause of action as well.

NEW TRIAL AS TO LIABILITY AND DAMAGES UNDER
PLAINTIFF'S SECOND THEORY OF NEGLIGENCE, VIZ.
<u>THE BELATED AFFIXING OF RESTRICTIVE LEGEND   </u>

Neither party has requested a new trial.  Under Federal Rule of Civil Procedure 59(d), the Court can sua sponte grant a new trial if it does so within ten days of judgment.  <u>See</u> Fed. R. Civ. P. 59(d).  Here, ten days have long since passed.  Although Rule 59 is the traditional procedural vehicle used to grant a new trial, the Court also has discretion to grant a new trial, sua sponte, under Rule 50(b), which provides as follows:

> In ruling on a renewed motion [for judgment
> as a matter of law], the court may:
>
> (1) if a verdict was returned:
>
>  (A) allow the judgment to stand,
>  (B) order a new trial, or
>  (C) direct entry of judgment as a

matter of law;

Fed. R. Civ. P. 50(b)(1).  However, under Rule 50(b), a new trial may only be granted if the moving party would be entitled to judgment as a matter of law.  See Goldsmith v. Diamond Shamrock Corp., 767 F.2d 411, 414 (8th Cir. 1985) ("[Rule 50(b)] by its very terms gives a court discretion to order a new trial absent a motion therefor only where the moving party otherwise would have been entitled to judgment notwithstanding the verdict."); Jackson v. Town of Hempstead, No. 98-CV-5635, 2002 WL 199834, at *2 (E.D.N.Y. Feb. 4, 2002) ("The Court may only grant a new trial under Rule 50(b) if the movant satisfies the stricter standard for judgment as a matter of law . . . . "); Newtown v. Shell Oil Co., No. 3:97 CV 0167, 2000 WL 49357, at *2 (D. Conn. Jan. 18, 2000) (noting that new trial under Rule 50(b) is "restricted to those cases in which the standard for granting . . . judgment as a matter of law has been met"); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2538 (2d ed. 1995) (same).

It is appropriate for a court to exercise its discretion and allow a new trial, even though judgment may have been ordered, where "the interests of justice would be better served by allowing the nonmovant an opportunity to cure its deficiencies of proof."  Jackson, 2002 WL 199834, at *2; see also Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 215-16 (1947); Networks Publications, Inc. v. Ellis Graphics Corp., 959 F.2d 212, 214 (11th Cir. 1992)("Of course, the court does

not have to grant the motion for judgment notwithstanding the verdict, even though he thinks the original motion for a directed verdict should have been granted.  This rule particularly provides that he may grant a new trial where justice would be served by it; where, for instance, it is obvious that the defect in proof of one side or the other is a thing that may be remedied at a new trial without perjury"; Goldsmith, 767 F.2d at 414 ("The discretion thus granted is addressed to the protection of the party whose judgment can be set aside to allow that the failure of proof, when only technical or when caused by error of the court or change in the law, be corrected."); 9A Wright & Miller, supra, § 2538 ("Thus the district court has discretion to order a new trial rather than grant judgment as a matter of law if it believes that the defect in the nonmoving party's proof might be remedied on a second trial, or if needed evidence was ruled out at trial by some error of the court.").

Here, given the attendant circumstances, the Court finds that a new trial is warranted with respect to plaintiff's second negligence theory.  The retrial will involve both the liability and damages aspects of that claim since (1) it cannot be determined from the jury's general verdict which negligence theory or theories were accepted by the jury, and (2) given the insufficient trial proof of damages under the second theory.  But the latter defect appears subject to possible remediation at a second trial.  The same may not be said, however, as to

the other two causes of action, and plaintiff's first negligence theory described, <u>supra</u>; accordingly, as to those claims, defendant's Rule 50(b) motion for judgment as a matter of law is granted.

CONCLUSION

For the reasons indicated, Liberty's Rule 50(b) motion is granted as to the Campbell's UCC-based, and conversion, causes of action, but denied as to the claim sounding in negligence which will be retried as explained above.

The parties are directed to appear before me for a pre-trial conference on January 19, 2007 at 2:30 p.m.

SO ORDERED.

Dated: December 19, 2006
       Central Islip, New York


___    _____/S/_____
       DENIS R. HURLEY
       Senior District Court Judge